Robert F. SIMONE, Appellant,

v.

GOLDEN NUGGET HOTEL AND
CASINO, trading as G.N.A.C.
Corp., Appellee.

Robert F. SIMONE, Appellee,

v.

GOLDEN NUGGET HOTEL AND
CASINO, trading as G.N.A.C.,
Corp., Appellant.

Nos. 87–1410, 87–1443.

United States Court of Appeals,
Third Circuit.

Argued Jan. 5, 1988.

Decided April 20, 1988.

William P. Murphy (argued), James Beasley, Beasley, Hewson, Casey, Colleran, Erbstein & Thistle, Philadelphia, Pa., for Robert F. Simone.

Martin L. Greenberg, Stephen N. Dratch (argued), Greenberg, Margolis, Ziegler, Schwartz, Dratch, Fishman, Franzblau & Falkin, P.A., Roseland, N.J., Edwin L. Scherlis, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, Pa., for Golden Nugget Hotel and Casino, trading as G.N.A.C. Corp.

Before SLOVITER, HUTCHINSON and ROSENN, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

The appeal and cross-appeal before us arise from an action brought by plaintiff-appellant Robert F. Simone against defendant-appellee Golden Nugget Hotel and Casino (Golden Nugget) for assault and battery, false imprisonment, malicious prosecution and abuse of process. The action was brought by Simone in the Philadelphia Court of Common Pleas and removed by Golden Nugget to the United States District Court for the Eastern District of Pennsylvania based upon diversity of citizenship. 28 U.S.C. §§ 1332, 1441(a) (1982).

Two jury trials have been held in this case. In the first, the jury found in favor of Simone on his false imprisonment and abuse of process claims, awarding him $150,000 in compensatory damages and $1,000,000 in punitive damages. However, the district court granted judgment notwithstanding the verdict on the abuse of process claim and ordered a new trial on the false imprisonment claim. In the second trial, the jury returned a verdict in favor of the Golden Nugget on false imprisonment. Simone moved for judgment notwithstanding the verdict or, in the alternative, a new trial. The district court denied these motions.

Simone appeals from the orders entered by the district court in each of these trials. The Golden Nugget cross-appeals, asserting various errors by the district court in the first trial, for the purpose of preserving its appellate rights in the event we accept any of Simone's arguments on his appeal. We have jurisdiction over the district court's order finally resolving this litigation in the Golden Nugget's favor by virtue of 28 U.S.C. § 1291 (1982). For the reasons that follow, we will affirm.

I

In the early morning of August 24, 1981, a floor person at the Golden Nugget called security for assistance at one of the Casino's blackjack tables. Security Sergeant Dixon determined when he arrived at the table that two patrons should be asked to leave the casino. When he told them to leave, they began walking towards an exit, but then entered the Rangoon Saloon, a lounge area adjacent to the casino floor. Sergeant Dixon called Security Captain Long to report what was happening. Either at the entrance to or in the Rangoon Saloon, appellant Simone asked Sergeant Dixon what the problem was with the two patrons and said that one or both were his clients. Simone was told their problem was none of his business. By this time Captain Long was at the scene. Long decided to formally evict Simone, the two men who had earlier been asked to leave the casino,

and another man who had joined this group.[1]

The four were escorted by seven or eight security guards from the Rangoon Saloon to a hallway and then into a service elevator area. The doors to this area were then closed and possibly barred. By all accounts, there was much pushing and shoving. Simone contends he was thrown into the elevator with such force he hit the back wall and slid to the floor. Sergeant Dixon testified he pushed Simone into the elevator after Simone charged at him.[2] The elevator malfunctioned and its doors opened back up into the service area. The guards then escorted the four men out to the valet parking area. Adjacent to the parking area was a stairway that led to the security command office where formal evictions took place.[3]

Several Atlantic City police officers were in the valet parking area.[4] The four were turned over to the police with a request that they be arrested. A struggle ensued among the four men and the police. The police handcuffed the four and took them to the police station.

Captain Long directed Sergeant Dixon and Officer Palmieri to go to the police station to file complaints against the four men. Dixon and Palmieri gave handwritten, signed statements to the police, and then signed complaint forms in blank. The police later typed formalized charges on the signed complaint forms. These formal complaints said that Simone struck the two security guards about the face and body. This was contrary to the written statements the security guards had given the police when they signed the complaints.

At the criminal trial on these assault charges, both Dixon and Palmieri testified in accordance with their written statements that Simone had not struck them about the face and body.[5] Simone was acquitted.

Simone then brought suit against the Golden Nugget for false imprisonment, assault and battery, malicious prosecution and abuse of process. The jury found in favor of Simone on the false imprisonment and abuse of process claims, and awarded him $150,000 in compensatory damages and $1,000,000 in punitive damages.[6] Each par-

1. "Formal" eviction is a procedure instituted by Golden Nugget in which a patron is told to leave the casino and informed that if he returns he will be arrested as a trespasser. *See infra* note 10. At the second trial, Captain Long testified that he told Simone he was being formally evicted when they were in the hallway, rather than in the Rangoon Saloon. He said he gave Simone only a warning in the Saloon. Captain Long did not testify at the first trial.

2. At the second trial Captain Long testified that he did not recall anyone going in the elevator. The dispute in the first trial was not whether the patrons and guards got into the elevator, but how they got into the elevator.

3. Apparently the group was enroute to the security command office when the police arrived.

4. At the first trial it was not established how the police officers came to be at the Golden Nugget. At the second trial Captain Long testified that he called the Atlantic City Police.

5. Sergeant Dixon's written statement read:
   At approx. 0350 A.M. I was called to Pit 2 BJ 8, on the above date. Upon arriving at the table we were requested to escort the four gentlemen in question from the casino. I approached the gentlemen and asked them to leave, stating that the casino management didn't want them in the casino ... they were

barred for the night. The gentlemen refused to leave in refusing the building they began to verbally assault myself and other officers. They walked into the bar when we approached them in the bar the verbal assults [sic] continued and the [sic] started a big disturbance. We escorted them out of the bar and headed for security command. Once we reached the main lobby they refused to go to command. They [sic] 4 suspects then began to verbally & physically assult [sic] us. They started pushing & shoving and stated that we had no right in putting them out. At thas [sic] point they started to swing at us. At that point we proceeded to take them physically into command. Upon getting them out of the building ACPD arrived and the [sic] took the gentlemen into custody.
App. at 352a (in handwritten form).

6. The jury was requested to answer special interrogatories on each claim and to award compensatory damages, if any, in a lump sum. They answered as follows:

1. Has the plaintiff proven a claim of malicious prosecution?
   YES____  NO  X
2. If you answered question no. 1 "yes," were defendant's actions a proximate cause of any harm to plaintiff?
   YES____  NO____

ty filed post-trial motions requesting judgment n.o.v. or a new trial on the issues decided in favor of the other. The district court granted judgment n.o.v. on the abuse of process claim, ordered a new trial on the false imprisonment claim and denied the remainder of the parties' motions.

At the second trial, the jury found in favor of the Golden Nugget on the false imprisonment claim. Simone filed a motion for judgment n.o.v. or a new trial on this issue, which the district court denied. This appeal and cross-appeal followed.

With respect to the first trial, Simone claims the district court erred in (1) denying his post-trial motions for judgment n.o.v. as to malicious prosecution and assault and battery, (2) granting judgment n.o.v. to the Golden Nugget on the abuse of process claim, and (3) ordering a new trial on his false imprisonment claim. He contends the district court also erred in denying his motion for judgment n.o.v. or a new trial on false imprisonment after the second trial. Appellee Golden Nugget asks us to affirm the second jury's finding in its favor as to false imprisonment. Alternately, it asserts that the district court properly granted judgment n.o.v. on abuse of process after the first trial and did not abuse its discretion in ordering a new trial on false imprisonment.

## II

■ In reviewing the district court's rulings on the parties' motions for judgment n.o.v., we apply the same standard as the trial court. *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.*, 789 F.2d 253, 258

3. Has the plaintiff proven a claim of false imprisonment?
   YES__X__ NO____
4. If you answered question no. 3 "yes," were defendant's actions a proximate cause of any harm to plaintiff?
   YES__X__ NO____
5. Has the plaintiff proven a claim of abuse of process?
   YES__X__ NO____
6. If you answered question no. 5 "yes," were defendant's actions a proximate cause of any harm to plaintiff?
   YES__X__ NO____
7. Do you find defendant responsible to plaintiff for assault and battery?

(3d Cir.1986). We are required "to review the record in this case in the light most favorable to the non-moving party, ... and to affirm the judgment of the district court ... unless the record is 'critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief.'" *Link v. Mercedes–Benz of North America, Inc.*, 788 F.2d 918, 921 (3d Cir. 1986) (quoting *Dawson v. Chrysler Motors Corp.*, 630 F.2d 950, 959 (3d Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981)).

■ In general, we review a district court's decision to grant a new trial for abuse of discretion. *Berndt*, 789 F.2d at 258. If, however, the court's decision is based upon its application of a legal precept, our review is plenary. *Link v. Mercedes–Benz*, 788 F.2d at 921. There is an abuse of discretion within the meaning of Federal Rule of Civil Procedure 59 "when the action of the trial judge is clearly contrary to reason and not justified by the evidence." *Vizzini v. Ford Motor Co.*, 569 F.2d 754, 760 (3d Cir.1977) (quoting *Springfield Crusher, Inc. v. Transcontinental Ins. Co.*, 372 F.2d 125, 126 (3d Cir. 1967)).

## III

In the first trial, the jury found that Simone had not proven his claims of assault and battery and malicious prosecution. See *supra* note 6. For the following reasons we conclude that the district court properly denied Simone's motions for judgment n.o.v. as to these claims.[7]

YES____ NO__X__
8. If you answered question no. 7 "yes," were defendant's actions a proximate cause of any injury to plaintiff?
   YES____ NO____
9. In what lump sum do you assess damages?
   $150,000

Submitted by Appellee at the direction of the Court, *And see* App. at 751a—752a.

The jury then heard argument and was instructed on punitive damages. It returned an award of $1,000,000 in punitive damages.

7. Following the first trial, Simone filed motions for judgment n.o.v. or a new trial. Before us,

## A.

■ Simone contends that there is no rational basis for the jury's finding against him on his assault and battery claim because it "cannot be denied" that he was "physically grabbed" and taken to the service elevator area. Appellant's brief at 29. However, as noted by the district court, Simone's account of the events of that morning was disputed. App. at 19a–20a. Sergeant Dixon denied picking Simone up and throwing him into the elevator. App. at 246a–247a, 260a–265a. He said that Simone was loud and used offensive language in the Rangoon Saloon, that he and other guards escorted Simone and the other men from the Rangoon Saloon and that he pushed Simone towards the elevator in response to Simone's attack upon him. App. at 243a–245a, 256a–265a.

It was the jury's function to assess the credibility of witnesses. Bearing this in mind, and viewing the evidence in the light most favorable to the Golden Nugget, in whose favor the jury found, we determine the jury could have found that any touching of Simone by security guards was justified under the circumstances. A casino may exclude disorderly patrons from its premises. *Uston v. Resorts Int'l Hotel, Inc.*, 89 N.J. 163, 173, 445 A.2d 370, 375 (1982).[8]

## B.

■ Simone contends he was entitled to judgment n.o.v. on his malicious prosecution claim at the first trial because the evidence indisputably shows that he was prosecuted unsuccessfully for an assault he did not commit, on the basis of complaints filed at the direction of the Golden Nugget that were signed in blank by two of its security guards. We disagree.

The jury was instructed properly on the elements of the tort of malicious prosecution under New Jersey law. App. at 627a–631a. To show malicious prosecution arising out of a criminal prosecution, a plaintiff must establish:

(1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff.

*Lind v. Schmid,* 67 N.J. 255, 262, 337 A.2d 365, 368 (1975). *And see Voytko v. Ramada Inn of Atlantic City,* 445 F.Supp. 315, 322 (D.N.J.1978).

With respect to element four, the jury was directed to find that the criminal proceeding against Simone did terminate favorably to him. The evidence bearing on the remaining elements showed that Dixon and Palmieri went to the Atlantic City Police Station while on duty, at the direction of Captain Long, to file charges against Simone. Both Dixon and Palmieri testified that they signed complaint forms in blank and that the charges typed in by the police were not correct.

Viewing this evidence and all justifiable inferences from it in favor of the Golden Nugget, we conclude the jury could have found that Simone failed to prove the requisite malice.[9] The discrepancy between

---

he argues only that judgment n.o.v. is warranted.

8. By this statement we imply no approval or condonation of the manner the casino had adopted to carry out its formal eviction procedure as shown by the testimony of various Golden Nugget personnel in these trials. *See infra,* at 1039–39. It would be one thing to briefly and incidentally detain a patron who persists in conducting himself in a disruptive or disorderly manner to take his photograph and advise him of the criminal charges for defiant trespass to which he is subject if he returns against the casino's wishes. It is another matter to attempt to forcibly remove him to an isolated upstairs room for those ostensible purposes.

9. Simone's failure to prove any one of the elements of malicious prosecution would defeat his claim. Because we conclude the jury could have found he failed to prove malice on the part of the Golden Nugget, we need not and do not reach the question of whether the Golden Nugget had probable cause to bring an assault charge against Simone. We note that both the district court and appellee incorrectly conclude, from the jury's finding of no malicious prosecution, that the jury must have found the Golden Nugget had probable cause to initiate the criminal proceeding against Simone.

the formal complaint and the statements given by Dixon and Palmieri was the only evidence produced by Simone which could have demonstrated malice on the part of the Golden Nugget in initiating the criminal prosecution. Because the record shows the security guards gave the police written statements setting forth a correct version of the facts on which a charge could have been based, but the police ignored or at least embellished them in filling in the blank complaints, the jury could have found that the error was attributable to the Atlantic City police and not to the guards or the Golden Nugget. *See Mondrow v. Selwyn,* 172 N.J.Super. 379, 386, 412 A.2d 447, 450–51 (App.Div.) (suggesting that malice would not be attributed to defendant who filed an inappropriate charge, when he "at least in part relied on police advice"), *certif. denied,* 84 N.J. 449, 420 A.2d 347 (1980). Thus, the jury had a rational basis for its finding that there was no malicious prosecution.

### IV

■ The critical issue as to the first trial is the propriety of the district court's granting of judgment n.o.v. on Simone's abuse of process claim. Simone correctly states that, in its opinion following the first trial, the district court erred in defining the elements of abuse of process as including lack of probable cause and in concluding that implicit in the jury's finding of no malicious prosecution was a predicate finding of probable cause that would defeat his claim for abuse of process. We agree that, under New Jersey law, absence of probable cause is not an element of abuse of process. *Ash v. Cohn,* 119 N.J.L. 54, 194 A. 174 (1937). The flaw in the district court's analysis in its opinion was not, however, present in its instructions to the jury at trial. Before us the Golden Nugget contends the order granting it judgment n.o.v. on abuse of process is supportable on the ground that Simone did not show it misused the legal process to extort or coerce a

collateral benefit for itself. We believe that argument is correct and the error in the opinion, therefore, does not require reversal of the district court's order granting judgment n.o.v.

■ We have carefully reviewed the record in this case. Although it does reveal irregularities in the process surrounding Simone's eviction, arrest and prosecution, it does not contain sufficient evidence to prove the Golden Nugget used the legal process of arrest on the charge of assault and battery for a purpose other than that which it was designed to accomplish. We will, therefore, affirm the district court's order granting judgment n.o.v. on this claim.

The district court correctly instructed the jury on the elements of abuse of process:

> Abuse of process is separate from malicious prosecution or false imprisonment. . . . . There are two basic elements necessary to sustain the cause of action of abuse of process. They are:
>> 1. That the defendant made an improper, illegal and perverted use of the legal procedure. That is to say, his resort to the legal process was neither warranted nor authorized by law;
>> And 2: That the defendant had an ulterior motive in initiating the legal process.
> In other words, abuse of process is the misuse or misapplication of the legal procedure in a manner not contemplated by law.

App. at 637a—638a. *See Ash v. Cohn, supra.*[10]

The elements of the tort of abuse of process and the manner in which they are to be proved have been explained on several occasions by the New Jersey courts:

> [T]he gist of this tort is the misuse of process justified in itself for a purpose other than that which it was designed to accomplish, and the essential elements are an ulterior motive and some further act after the issuance of process repre-

---

**10.** Whether the process said to be abused is civil or criminal is immaterial. *See* Restatement

(Second) of Torts § 682 (1977).

senting the perversion of the legitimate use of the process. [*Gambocz v. Apel*, 102 *N.J.Super.* 123, 245 *A.*2d 507 (App. Div.), *certif. den.* 52 *N.J.* 485, 246 *A.*2d 447 (1968).] Bad motives or malicious intent leading to the institution of a civil action are insufficient to support a cause of action for malicious abuse of process. A showing of some coercive or illegitimate use of the judicial process is necessary to a claim that there has been an abuse of the process. *Penwag Property Co. v. Landau*, 148 *N.J.Super.* 493, 372 *A.*2d 1162 (App.Div.1977); *Mayflower Industries v. Thor Corp.*, 15 *N.J.Super.* 139, 83 *A.*2d 246 (Ch.Div.1951), aff'd 9 *N.J.* 605, 89 *A.*2d 242 (1952); *Am.Jur. Abuse of Process* § 4; Prosser, *Law of Torts* (4 ed. 1971), § 121.

*Fielder Agency v. Eldan Constr. Corp.*, 152 N.J.Super. 344, 348–49, 377 A.2d 1220, 1222 (Law Div.1977).

Thus, with one gloss on the requirement that there be an improper use of legal procedure, explained in *Fielder, supra,* and discussed below at 1038, the New Jersey cases appear in accord with the Restatement formulation of the tort of abuse of process. That information is:

> One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process.

Restatement (Second) of Torts § 682 (1977).

Simone argues that the jury at the first trial could have inferred from the evidence that the Golden Nugget arrested him in order to coerce him into agreeing not to return to the casino, *i.e.,* for the purpose of accomplishing his formal eviction.[11] So inferring the ulterior motive from the circumstances surrounding the use of the arrest process, he contends the motive ele-

ment of this tort under New Jersey law is satisfied.

Unquestionably, the Golden Nugget used the legal process of arrest against Simone. From the evidence that Simone was told he was being formally evicted and the evidence of the effect of a formal eviction, a jury could infer that the Golden Nugget did not want Simone to return to its casino.

What is missing from the record, however, is evidence of any connection between the arrest and a purpose of preventing Simone from returning to the Golden Nugget. What the record does show is a disturbance, attendant upon a continuing effort to formally evict Simone. There is no evidence to show Simone was refused reentry, or that he was ever told that the criminal charges against him could be disposed of favorably if he agreed to a formal eviction or that the charges were instituted or pressed for the collateral purpose of securing his formal eviction. The record shows that an arrest was made and formal charges instituted on behalf of the Golden Nugget in the face of a public disturbance which had spilled into the streets. The use of an arrest to quell such a disturbance is a legitimate use of criminal process. The record does not show that Simone was arrested primarily to coerce or extort from him a concession unrelated to an ending of the disturbance, a requirement that has been described by Prosser as follows:

> The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

---

**11.** As described by the district court, the Golden Nugget's formal eviction procedure

is applicable in non-arrest situations to persons whom the casino seeks to bar from its premises *in futuro* because of disorderly or otherwise objectionable conduct. The patron is escorted to an upstairs office where a pho-

tograph is taken and an eviction form statement is read. The patron is then escorted from the building and told the consequences of returning, that is, arrest for defiant trespass.

App. at 16a (footnote omitted).

W. Prosser & W. Keeton, *The Law of Torts* § 121 at 898 (5th ed. 1984). *And see Earl v. Winne,* 34 N.J.Super. 605, 615, 112 A.2d 791, 796 (Law Div.1955) ("[I]t must always be shown that an unlawful act in the use of the process compelled the wrongful extortion or restraint of the person to give rise to liability.").

Alternately, even if the ulterior motive of accomplishing a formal eviction could be inferred from circumstantial evidence adduced during the first trial, Simone has failed to prove an additional requirement under New Jersey law. Unlike the view expressed in the Restatement and Prosser, which would permit liability without regard to whether the improper coercive act occurred before, after or coincident with the institution of the legitimate process itself, New Jersey law requires a further coercive act after the process issues in order to prove an improper use of legal procedure. *See Fielder Agency,* 152 N.J.Super. at 348, 377 A.2d at 1222 (essential elements of abuse of process are an ulterior motive and some further act after issuance of process showing the perversion of its legitimate use); *Penwag Property Co. v. Landau,* 148 N.J.Super. 493, 499, 372 A.2d 1162, 1165 (App.Div.1977) (person who institutes process must perform a further act after its issuance representing a perversion or abuse of its legitimate purposes), *aff'd,* 76 N.J. 595, 388 A.2d 1265 (1978); *Gambocz v. Apel,* 102 N.J. Super. 123, 132, 245 A.2d 507, 511–12 (App.Div.) (in the absence of conduct that can be considered an abuse of process, evidence of defendant's private interest in seeing plaintiff subjected to legal process does not suffice to show an abuse), *certif. denied,* 52 N.J. 485, 246 A.2d 447 (1968).

Simone has failed to show any later, improper act. He claims that the Golden Nugget participated in the criminal trial through the testimony of the security guards and that this testimony, together with the misstatement in the formal complaint that Simone had struck the guards about the head and body, inserted by the police after the security guards had signed the complaint in blank, were further acts constituting an illegitimate use of process.

The record shows, without contradiction, that the error in the formal charge was made by the police. While we do not condone the practice of signing criminal complaints in blank and leaving their content to the police, we note that in *Gambocz v. Apel, supra,* the New Jersey court held no abuse of process occurred when a complainant who later withdrew a bad check charge had been instructed to file a complaint by public officials and had signed it in blank.

Simone produced no evidence to show the Golden Nugget was aware of the discrepancy between the written statements submitted by its security guards and the formal charge before trial but failed to inform the prosecutor. At the criminal trial in Atlantic City, neither Dixon nor Palmieri testified falsely in support of the erroneous charge; both said that Simone had not struck them about the face and body. Even if the Golden Nugget had been apprised of the discrepancy between its guards' written statements and the charge as formalized by the police, there are indications New Jersey would not hold it accountable, through liability in tort, for any "overcharge." In discussing an "overcharge" situation, the Superior Court of New Jersey has noted that "[e]ven trained lawyers and judges sometimes experience difficulty and disagreement determining which kind of an assault charge is supported by a given set of facts." *Mondrow v. Selwyn,* 172 N.J.Super 379, 386, 412 A.2d 447, 451 (App.Div.), *certif. denied,* 84 N.J. 449, 420 A.2d 347 (1980).

■ We acknowledge Simone's challenge to the legitimacy of the Golden Nugget's formal eviction policy and emphasize that our conclusion that there was no abuse of process here does not mean that we approve or condone such a procedure. The common law right of an innkeeper to exclude the disorderly does not include the right to take a patron who is willing to leave an establishment, against his or her will, to a private place in order to read that person an eviction notice. We do not accept the Golden Nugget's bootstrapping ar-

gument that it may only effectuate its right to have a defiant trespasser arrested by carrying out the formal eviction procedure described above. Similarly, we reject the Golden Nugget's argument that the Casino Control Act, N.J.Stat.Ann. §§ 5:12–1 to –190 (West Supp.1987), provides authority, beyond the common law, for such a formal eviction process. Section 71 of the Act, to which the Golden Nugget refers, does authorize the Casino Control Commission to compile a list of persons to be excluded from gaming casinos whose presence in a casino would be inimical to the interests of casino gambling in New Jersey. N.J.Stat.Ann. § 5:12–71(a)(3). "The section applies to persons whose backgrounds or occupations indicate either criminal activity or actions hostile to the integrity of licensed casino gambling." *Uston*, 89 N.J. at 170 n. 3, 445 A.2d at 373 n. 3. We fail to see how Section 71 can be read so broadly as to give the Golden Nugget the right to prevent an arguably disorderly patron from leaving its premises so that it may conduct a formal eviction.

Although we do not approve the formal eviction policy which the Golden Nugget attempted to carry out on August 24, 1981, we cannot agree with Simone that the Golden Nugget's attempt to implement that procedure is a sufficient basis for a jury finding of abuse of process. To prove an abuse of process, New Jersey law requires an ulterior motive and an improper act after issuance of process. *See* cases cited *supra* at 1037–38. The acts undertaken by the security guards in their attempt to formally evict Simone all occurred before issuance of process and, therefore, do not support a finding of improper use of legal process. In filing charges against Simone for what it considered assaultive behavior during the eviction process, the Golden Nugget opened itself to potential liability for malicious prosecution if a jury found that it did so out of actual malice and also lacked probable cause to initiate criminal proceedings. Malice in fact and lack of probable cause are not, however, elements of the tort of abuse of process. *Ash v. Cohn*, 119 N.J.L. at 58, 194 A at 176.

Finally, we do not believe the New Jersey Supreme Court would interpret the statement in *Ash v. Cohn*, that the ulterior motive necessary to the tort of abuse of process "may be inferred from the improper act," as broadly as Simone argues. 119 N.J.L. at 58, 194 A. at 176. It seems to us this statement simply indicates that New Jersey law is in accord with the general position taken in the Restatement that abuse of process, unlike malicious prosecution or wrongful use of civil proceedings, does not require proof of evil motive, ill will or actual malice, but only an improper purpose demonstrated by an extortionate act. As a matter of policy, we do not believe the New Jersey Supreme Court would permit an inference of improper purpose simply from the institution of a prosecution to adjudicate an ongoing dispute between two parties, which had its genesis in an earlier incorrect assertion of legal right by the party who initiates the later process. As stated in *Ash v. Cohn*, "The legal pursuit of one's right, no matter what may be the motive of the promoter of the action, cannot be deemed either illegal or inequitable." *Id.* (quoting *Davis v. Flagg*, 35 N.J.Eq. 491, 494 [1882]).

The dispute over whether the Golden Nugget had a right to formally evict Simone, its manner of effecting the eviction and the reasonableness of Simone's actions in resisting it are the subject of the other torts he claimed, or could have claimed, the Golden Nugget committed against him in this action. Thus, if eviction was wrongful, relief was available to him for assault and battery. The jury found against him on this claim. Confinement in the elevator or elsewhere in the casino was actionable as false imprisonment. The first jury found in his favor on that claim. The arrest and charge for assault and battery was the subject of his claim for malicious prosecution as well as abuse of process. On the malicious prosecution theory the jury found against him. Since he was unable to sustain that theory we must assume that the arrest and prosecution were in and of themselves not improper. To permit him to establish an abuse of process without further evidence of an effort by the

Golden Nugget to use this prosecution as a means of extorting an abandonment of his right to remain on the premises or be free from false imprisonment would subject the Golden Nugget to civil liability without proof that it had done anything other than honestly assert its right. Such a risk is unlikely to encourage a party to a hot dispute to resort to law instead of self-help. In eliminating ill will and lack of probable cause from the tort of abuse of process, while requiring a further coercive or extortionate act beyond the process itself, New Jersey balances the social interests of encouraging resort to law instead of violence and protecting individuals from coercive use of legal process for ulterior purposes.

In summary, Simone has failed to show that the Golden Nugget made an improper or perverted use of legal process through its actions arising from the events on August 24, 1981. Although the formal complaints contained a misstatement and were signed by Dixon and Palmieri in blank, this irregularity in the process does not amount to an abuse of process by the Golden Nugget on this record. Accordingly, judgment n.o.v. was properly granted.

## V

■ Simone's final argument with respect to the first trial is that the granting of a new trial on his false imprisonment claim, on which the jury had found in his favor, was not proper. Alternately, he contends that a new trial should be limited to the question of damages.

When instructing the jury on damages, the district court stated that an award for future medical expenses should be based upon "a reasonable degree of certainty." App. at 650a–651a. In his post-trial motions as to the assault and battery and malicious prosecution findings, Simone argued that this charge was erroneous, and that the appropriate standard under New Jersey law is "reasonable probability." *Evers v. Dollinger*, 95 N.J. 399, 471 A.2d 405 (1984); *Coll v. Sherry*, 29 N.J. 166, 148 A.2d 481 (1959). Reasoning that the difference between the two standards might have affected the jury's evaluation of the evidence in its assessment of damages as to the false imprisonment claim, the district judge granted a new trial on this issue.

Since the jury found in his favor on false imprisonment and he did not raise any allegations of error with respect to that finding, Simone argues that the district court erred in ordering a new trial because of the discrepancy in the damage instruction. We agree that the error in the charge would not have been a valid ground for ordering a new trial. It does not follow that the court's order granting a new trial in this case was erroneous.

What Simone overlooks is the effect of the court's granting of judgment n.o.v. as to his abuse of process claim. In the first trial, the jury answered special interrogatories on each claim but awarded damages in a lump sum. Once judgment n.o.v. was granted on abuse of process, one of the two claims on which the jury found in Simone's favor, the district court would have had to grant a new trial, at least on the damages issue. The court's error in concluding that a new trial was warranted because of the erroneous damages instruction was, therefore, harmless. Fed.R.Civ. P. 61. The question then becomes whether the district court abused its discretion in granting a new trial generally and not limiting it to damages.

■ In its discretion, a trial court may limit a new trial to a portion of the issues litigated in the first trial. Fed.R.Civ.P. 59(a). *And see Vizzini v. Ford Motor Co.*, 569 F.2d 754, 759 (3d Cir.1977). The standard for determining whether a partial new trial is proper was long ago established: "Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). We have interpreted the *Gasoline Products* standard to prevent determination of damages separate from liability when there is a complex or tangled fact situation. *Stanton v. Astra Pharmaceutical Prod-*

*ucts, Inc.*, 718 F.2d 553, 576 (3d Cir.1983); *Vizzini v. Ford Motor Co.*, 569 F.2d at 761.

As stated by the district court, it is not clear from the jury's answers to interrogatories whether it attributed any of Simone's physical injuries to the claim of false imprisonment. To calculate compensatory damages in a new trial, that jury would have to determine which, if any, of Simone's injuries were incurred because of the false imprisonment. To do that, it would first have to find at what points the unlawful detention began and ended. Moreover, on the question of punitive damages, the jury would have to assess the conduct of the Golden Nugget to determine whether it acted with malice or in willful disregard of Simone's rights. The issues of liability and damages are interwoven warp and woof on this record. Therefore, the district court did not not abuse its discretion in granting a new trial on both issues.

### VI

Finally, Simone challenges the propriety of the district court's trial and post-trial rulings with respect to the second trial, in which the jury found there was no false imprisonment. For the following reasons, we find these challenges without merit.

### A.

First, Simone contends that this verdict is not supported by the evidence and that he is, therefore, entitled to either judgment notwithstanding the verdict or a new trial on this claim. We have reviewed the record before us to assess the sufficiency and weight of the evidence and conclude the district court properly denied Simone's post-trial motions.

As the district court instructed the jury, it is clear that Simone was detained by security at the Golden Nugget. The questions before the jury were, first, at what point(s) the detention occurred, second, whether the detention was lawful, and, finally, whether it was carried out in a reasonable manner. App. at 2379a–2380a. Simone contends he was unlawfully detained from the time he was escorted from the Rangoon Saloon until he was released from the Atlantic City Police Station.

As an initial matter, the jury could have found that Simone was held at the police station for reasons independent of his detention by Golden Nugget security. Officer Hippel of the Atlantic City Police Department testified that he was dispatched to the Golden Nugget on August 24, 1981, where he took Simone into custody, and that he filed a complaint against Simone as a result of Simone's conduct towards him at the police station. App. at 2115a–2119a.

Crediting Security Captain Long's testimony, the jury could have found that Simone went from the Rangoon Saloon at the Golden Nugget to the service elevator lobby of his own volition. It also could have concluded that from that time forward he was detained by security pending the arrival of the Atlantic City police because he was disorderly and had assaulted a security guard. Captain Long testified that when he arrived at the Rangoon Saloon he decided to evict the two patrons who had been at the blackjack table. App. at 1705a–1706a. He informed the two men that they were being evicted and told Simone it was not his business when he attempted to intervene. App. at 1707a–1708a. The entire group then left the Rangoon Saloon. Long described the events leading up to the arrival of the Atlantic City police as follows:

Q. What did you [Long] do?

A. I just went along with the group. I mean, there was no physical contact whatsoever. I mean, everybody just said no problem, let's go, out the back door, with Mr. Simone and the other two gentlemen were also included. I didn't include them verbally at that time, they just basically followed the group out.

Q. All right. That's Mr. Simone and someone followed the group out?

A. Yes.

Q. Okay. So now where are you?

A. We are out in the lobby area adjacent to that baggage storage room and up to the right—to the left hand side

of the baggage room there is a set of double doors there that leads you into an elevator lobby which will take you up to the security department office. There is an elevator in there.

Q. All right. Then what happened next?

....

A. Like I said, there is a set of double doors to the right—on the right-hand side there to the left of the baggage room and we were directing these two gentlemen to go—which we had no problem, they walked right in, no problem, we had no problem.

Q. Right. What did the plaintiff do, Mr. Simone?

A. Mr. Simone at that time was getting loud again in the hotel lobby.

Q. What was he saying?

A. He was just ranting and raving about these are associates of mine and —inferring that you aren't going to take them to where I wanted to take them at the time, loud and disorderly I would say.

....

THE COURT: .... What, if anything, did you say to Mr. Simone in the hallway?

THE WITNESS: I told Mr. Simone that he was going to be formally evicted and would he please make the right-hand turn in the lobby and that we were going up to the security department office and we were going to go through our procedure that we usually do.

....

Q. All right. Where did you go from that point in the lobby with this group?

A. The entire group made a right-hand turn and went inside the elevator.

....

Q. Tell us what happens next. What—withdraw that.

What does Mr. Simone do in that area, if anything: What's he saying, What's he doing? Describe his actions, please.

A. He is belligerent, loud, making threats against—trying to stop us from doing our job, which is trying

to—we were escorting these people upstairs.

Q. What kind of threats or words was he using?

A. Well, racial slurs.

....

Q. Talk about Simone, if you will, the plaintiff. What was he doing, if you can tell us, during that period of time you are now describing when there was a lot of pushing and shoving? What was he doing?

....

A. Throwing arms around, I guess closed hands, fists, and we did the best we could or Sergeant Dixon did the best he could to try to restrain these people from either hurting someone else or hurting themselves, for that matter, because it is a very enclosed area.

Q. Okay. What did you do next?

A. At that time, as far as I can determine, with my experience, we had an assault. I got on my radio, called the Atlantic City Police Department. Again, there was a lot of pushing and shoving in that little small area that's an elevator lobby between five of the people that were included in that area that we were attempting to escort upstairs.

....

Q. Where did you go with the group after the elevator lobby incident?

....

A. You make a turn in here and it leads you out through this baggage door right to the outside of the building to the porte cochere where valet parking is where the police pulled their patrol vehicle up to.

App. at 1708a—1716a.

The tort of false imprisonment is established by showing an "unlawful restraint" upon a person's freedom of locomotion. *Bartolo v. Boardwalk Regency Hotel Casino*, 185 N.J.Super. 534, 536, 449 A.2d 1339, 1341 (Law Div.1982) (quoting *Earl v. Winne*, 14 N.J. 119, 128, 101 A.2d 535 (1953)). If Simone went voluntarily from

the Rangoon Saloon into the hallway and elevator area, then he was not detained against his will at that time. Because he was not unlawfully detained, he was not justified in pushing or shoving the guards in those areas, and Captain Long had cause at that point to detain him pending the arrival of the police. Captain Long's testimony provides a rational basis for the jury's finding that there was no false imprisonment.

In reviewing this record and the parties' briefs, we have contended with about as many versions of the facts as there are witnesses, a situation not uncommon in this kind of case.[12] It was, therefore, peculiarly the jury's function to assess the credibility of these witnesses, to draw inferences from the evidence it found credible and, having done so, to weigh all the evidence and inferences and render its verdict. So viewed, this verdict is not against the weight of the evidence.

### B.

Simone also contends the district court's charge to the jury was prejudicial and thus would warrant a new trial. The district court instructed the jury on the law with respect to defiant trespass, disorderly conduct and assault and battery so that the jury could consider whether the conduct of both the Golden Nugget and Simone was reasonable under the circumstances that existed on the morning he alleges he was falsely imprisoned. The court's instructions with regard to Officer Hippel's testimony and the criminal charge filed by Officer Hippel against Simone were proper because Simone claimed his false imprisonment continued throughout the time he was detained at the Atlantic City Police Station. In order for us to find these allegations of

error with respect to the jury charge meritorious, we would have had to agree with Simone's position that the detention by Golden Nugget security personnel began before he entered the service elevator lobby area and, therefore, held that the district court should have granted judgment n.o.v. on false imprisonment. Because there was a rational basis for the jury's verdict and these allegations of error do not have an independent basis, they must fail. We have examined the district court's charge to the jury in its entirety and determine that it fairly and adequately submitted the issues to the jury. *United States v. Fischbach and Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir.1984) (quoting *Ayoub v. Spencer*, 550 F.2d 164, 167 (3d Cir.), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977)), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985).

### C.

Finally, Simone claims the district court erred in precluding him from cross-examining one of the Golden Nugget security guards.[13] We have reviewed the record and conclude that the district court's rulings did not unduly limit Simone's cross-examination of this witness. The district court properly instructed counsel, and then the jury, that it was the jury's function to decide whether the witness's present recollection or his recollection at the first trial in this matter was reliable. *See Milwaukee Gear Co. v. Charles Benjamin, Inc.*, 466 F.2d 588, 592 (3d Cir.1972) (trial judge has considerable discretion in procedure for allowing use of prior inconsistent statements and cross-examination of witnesses).

---

**12.** In addition, neither Officer Hippel nor Captain Long testified at the first trial in this matter.

**13.** Simone contends this occurred when the security guard was not permitted to complete the following exchange:

Q. Do you [security guard] see the question on line 18, that is, "The security personnel prevented these men from leaving the hotel; isn't that true?" What was your answer?
A. "Until they got read the form, yes sir."

Q. Now, does that refresh your recollection?
A. I believe it was true at that time, yes.
Q. Is it true today?
The Court: Well, just a minute. It is for the jury to decide what's true. The jury should decide whether or not his present recollection is reliable or whether the 1983 recollection is more reliable.
App. at 2050a. Simone then continued his cross-examination of this witness.

## VII

Having found no reversible error in the district court's rulings challenged by Simone with respect to either trial, we will affirm.[14]

---

**14.** Because of our disposition of the issues raised by Simone, we do not reach the issues raised by the Golden Nugget in its cross-appeal.